UNITED STATES of America

v.

Friedemann SOMMERFELD.

No. 27899.

United States District Court
E. D. Pennsylvania.

Dec. 14, 1962.

Drew J. T. O'Keefe, U. S. Atty., Sullivan Cistone, Asst. U. S. Atty., Philadelphia, Pa., for plaintiff.

George Gershenfeld, Philadelphia, Pa., for defendant.

CLARY, Chief Judge.

This is an action under Title 8 U.S. C.A. § 1440(c) for revocation of citizenship of Friedemann Sommerfeld, defendant herein.

Sommerfeld was born on January 21, 1933, in Hamburg, Germany. His father died in a concentration camp in 1942 and his mother died in 1951. Under the sponsorship of Doctor and Mrs. Louis Scheffey, of Havertown, Pennsylvania, he came to the United States in 1951. He fixes the date of his departure from Germany as the 16th of June, 1951. He went to live with the Scheffeys and, after being in the country approximately six months, decided to enlist in the Air Force and obtain citizenship under the provisions of Public Law 86, 83rd Congress, First Sess., 67 Stat. 108. This statute provided that any person not a citizen, lawfully admitted to the United States, who served honorably in the Armed Forces between June 24, 1950 and July 5, 1955, might be naturalized on petition. Under this provision, defendant Sommerfeld was admitted to citizenship at South Ruislip, Middlesex, England, and issued Certificate of Naturalization No. OS–2960. The record of said naturalization proceeding was duly forwarded to and filed in the United States District Court for the Eastern District of Pennsylvania at Philadelphia, Pennsylvania.

Defendant served in the Air Force in England until March of 1955 when he was arrested, charged with desertion, unlawful entry with intent to commit larceny, theft of a Ford automobile of a value of $1260., property of one Cyril Price, and theft of a 30 caliber carbine of a value of $76.62, and a 45 caliber

pistol of a value of $78.27, property of the United States. Having been absent from his organization from March 27 until April 4, he was arrested with the stolen automobile by civil police and turned back to the military. While in custody, he escaped from lawful confinement in the base guardhouse and was again apprehended. He was tried before a General Court-Martial convened at the Royal Air Force Station East Kirkby, Lincolnshire, England, on the above named charges, found Guilty, and was sentenced to be dishonorably discharged from the service, to forfeit all pay and allowances, and to be confined at hard labor for six years, later reduced to five years. After serving the first part of his jail term at New Cumberland, Pennsylvania, Military Prison, and the latter part at the Federal Correctional Institution at Danbury, Connecticut, he was paroled, and his parole record shows a fair adjustment without any significant features either good or bad.

The Government, pursuant to the provisions of Title 8 U.S.C.A. § 1440(c), has brought this action for revocation of citizenship. This provision provides that citizenship *may* be revoked if the discharge of the soldier acquiring it be other than honorable. In this case, it was clearly dishonorable.

The only defense interposed in this case, and the only possible one, of course, since the Act itself provides that certification of the Executive Department establishes the prima facie case for the Government, was that the Court should not exercise the discretion granted it by the statute in favor of revocation of citizenship, but, on the contrary, should exercise it in favor of the defendant. The defendant relies in great measure upon the decision of Chief Judge Bruchhausen of the United States District Court for the Eastern District of New York in United States v. Meyer, 181 F. Supp. 787 (1960). In that case, Judge Bruchhausen, after trial, stated that he was disposed, under the facts of that case, to leniency and exercised his discretion in favor of the defendant. Sig-

nificantly, however, he remarked that the offenses of which the defendant was found guilty and which led to his dishonorable discharge were committed while off duty and were unconnected with military operation.

This case presents an entirely different picture. The defendant appears to be a young man in an awful hurry. Against the advice of his benefactors, Doctor and Mrs. Scheffey, he accelerated the immigration of his sister to the United States. The sister, now Mrs. Rita Garey, who impressed the Court as a very fine person and is married to an American citizen, testified at the trial of this case on behalf of the defendant. Doctor and Mrs. Scheffey, who had brought up the young lady practically as their own daughter, also testified. However, their contacts with the defendant, after he joined the Air Force, were few.

When the defendant first suggested his enlistment in the Air Force to facilitate citizenship, Doctor Scheffey did not oppose it, hoping that the experience would prove valuable to the defendant. In England, however, the young man became quite an entrepreneur. In conjunction with a local cleaning and dyeing concern, he organized his own laundry or dry cleaning business on the base in competition with the Post Exchange and against regulations, established an import business for clothing, haberdashery, and other things which he sold to the soldiers on the base, and even established a bus route for soldiers on leave or pass in direct violation of British law. He felt quite persecuted when his commanding officer forced him to desist from these enterprises, and attributes his later trouble to this persecution complex. He stated that he had always thought of establishing a travel bureau and felt that navigational maps and charts used by his squadron could give him a good insight into conducted tours of Europe. The fact that some of these maps were marked "confidential" did not seem to bother him as he removed them from the base without permission to the apartment of a girl friend. It was the

finding of these maps by the local police and their return to proper custody that led him to steal a Ford automobile, a 45 revolver, and a 30 caliber carbine, and "go over the hill." Apprehended by local police and returned to the base, he broke jail and was gone again until later apprehended.

Fortunately for this defendant, the maps which were in his possession had been declassified shortly before they were discovered in his possession, a fact, however, which he did not know at the time he purloined them. He was convicted on all charges and the sentence duly followed. Since his release from jail, he has gone from job to job. This is the story of the gentleman in whose favor I am asked to exercise my discretion.

It appears from the recital of the foregoing facts that the Court should refuse to exercise its discretion in favor of the defendant. Every offense committed by him was against the military and arose out of his military service. He was given his American citizenship by the Congress of the United States in return for his willingness to serve the country in time of crisis. He intended to and did take full advantage of the generosity of the Congress in securing American citizenship. The Congress clearly recognized that there would be cases where the discharge of a soldier under other than honorable conditions should not automatically cancel citizenship. This is demonstrated by the permissive language of the Act. I am also certain that it was never the intention of the Congress that flagrant violations of military and civil law, intentional in character, should be condoned. The declassification of the navigational maps and charts undoubtedly saved this defendant from much more serious charges than those for which he was convicted.

From all of the facts and circumstances, and the records which were made available to the Court by the United States Attorney and by counsel for the defendant, it is the considered opinion of the Court that this case is not one which calls for the exercise of the Court's discretion in favor of the dishonorably discharged soldier.

The petition of the Government will, therefore, be allowed.